IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHARLES A. WALDREN,                    :

      Plaintiff,

    v.                                      :      Case No. 3:18-cv-290

ALLSTATE VEHICLE AND                          JUDGE WALTER H. RICE
PROPERTY INSURANCE
COMPANY, et al.,                       :

      Defendants.

---

**DECISION AND ENTRY SUSTAINING DEFENDANT ALLSTATE
VEHICLE AND PROPERTY INSURANCE COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR
BAD FAITH, UNJUST ENRICHMENT, AND DECLARATORY
JUDGMENT (DOC. #52); SUSTAINING DEFENDANTS RICHARD L.
RUBY AND SRB INSURANCE CONSULTANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #60)**

---

After fire caused extensive damage to his two-story house, Plaintiff Charles

A. Waldren filed a claim with his insurance company, Allstate Vehicle and Property

Insurance Company ("Allstate"). Invoking the "Intentional Acts" and

"Misrepresentation, Concealment or Fraud" provisions of the homeowner's policy,

Allstate denied Waldren's insurance claim in its entirety.

Waldren then filed suit. His First Amended Complaint, Doc. #40, asserts

claims of breach of contract, bad faith, and unjust enrichment against Allstate, and

seeks declaratory judgment concerning coverage and policy limits. Waldren has

also brought a claim of tortious interference with contract against Richard Ruby of

SRB Insurance Consultants, Ltd. ("SRB"), who assisted Allstate in investigating Waldren's insurance claim.

This matter is currently before the Court on two pending motions: (1) Defendant Allstate's Motion for Partial Summary Judgment on Plaintiff's Claims for Bad Faith, Unjust Enrichment, and Declaratory Judgment, Doc. #52; and (2) Defendants Richard L. Ruby and SRB Insurance Consultants' Motion for Summary Judgment, Doc. #60.

## I.    Background and Procedural History

Charles Waldren owns a house located at 135 Stainton Avenue in Dayton, Ohio. Darlene Talley lives there with him. He purchased the house in July of 2016. In September of 2016, there was a small electrical fire in the fuse box in the basement. The Dayton Fire Department ("DFD") extinguished the fire, but the electric company turned off power to the house until the electrical system was updated. Waldren and Talley did not have funds to make the necessary repairs so, although they continued living in the house, they used battery-powered LED lights and candles for illumination.

On the night of October 15, 2016, Waldren and Talley allegedly left their house between 9:30 and 9:45 to take their dogs to the Deeds Point Dog Park, locking the door behind them. Doc. #13, PageID##650, 660. At 10:08 p.m., a neighbor called 911 to report that the house was on fire. Doc. #40-3, PageID##2495, 2502. The DFD responded to the scene and extinguished the fire.

2

Jennifer Godsey, the DFD Investigator, was still on the scene when Waldren and Talley returned home. *Id.* at PageID#2502.

Waldren and Talley told Godsey that, when they left the house at 9:45, they likely left a candle burning on a desk in the first-floor office at the back of the house. *Id.* Godsey found what appeared to be the remains of that candle, which was in a clear glass dish, sitting on the corner of the desk. In her report, Godsey found that the candle was "the only competent ignition source at the area of origin." She concluded that the fire was caused by that unattended candle and ruled the fire accidental in nature. *Id.* at PageID#2501.

At the time, Waldren was the named insured on a homeowner's policy issued by Allstate. Doc. #25-2. The policy was effective from October 14, 2016—the day before the fire—until October 14, 2017. Doc. #40-1, PageID#2460.[1] On October 16, 2016, Waldren submitted a claim for the fire loss. Within days, Allstate referred it to its Special Investigations Unit based on the fact that this was a brand-new policy and there was some evidence that Waldren was experiencing financial distress. Doc. #25-1, PageID##1536, 1550, 1554, 1578. Allstate advanced alternative living expenses for Waldren and Talley for a short

_____

[1] Allstate had issued an earlier insurance policy when Waldren bought the house. However, on August 19, 2016, Allstate canceled that policy because Waldren did not make roof repairs required by the underwriter within the time allotted. Doc. #13, PageID#654; Doc. #14, PageID#694; Doc. #25-1, PageID#1571. Waldren subsequently had the repairs completed and Allstate reinstated the policy effective October 14, 2016.

3

time but, on October 24, 2016, discontinued them pending completion of the investigation. Doc. #25-4, PageID#1661.

Despite the DFD's determination that the fire was accidental in nature, Allstate denied Waldren's claim in its entirety in April of 2017, citing the "Intentional Acts" exclusion and the "Misrepresentation, Concealment, or Fraud" provision of the policy. Doc. #25-1, PageID##1543, 1585; Doc. #25-3, PageID##1641-44. Allstate based its decision on the report of Certified Fire Investigator Brent Schockman of Fire Science Investigations, on the statements given under oath by Waldren and Talley, and on the report of Richard L. Ruby of SRB Insurance Consultants, Ltd., who conducted witness interviews for Allstate.

At Allstate's request, Brent Schockman investigated the origin and cause of the fire. He examined the scene of the fire on October 18, 2016, and gave Allstate an initial verbal report on October 24, 2016. Doc. #24-4, PageID#1466. He issued a full investigative report on April 7, 2017. Doc. #24-2.

Schockman testified that he obtained an incident report from the DFD and spoke with Jennifer Godsey shortly after the fire. At that time, she told him that she believed that the fire was the result of an unattended candle. Nevertheless, he did not see a copy of the DFD investigative report until July of 2018, more than one year after he submitted his report to Allstate. Doc. #24-1, PageID##1321, 1324.

Godsey told Schockman that Waldren and Talley told her that the candle was on the desk in the office. However, they told Schockman that the candle was

4

on top of the computer tower on a wooden stand *next to the desk*. *Id.* at PageID##1322-24.  Schockman found a small glass jar sitting on the desk, but it did not appear to be a candle.  Consistent with what the insured told him, he did observe a protected area on top of the computer tower, where the candle may have sat, and curved broken glass from the candle on the floor next to that wooden stand.  However, he found no wax remains.  Doc. #24-1, PageID#1324, 1327, 1343.

The desk and wooden stand were located to the left of the window that was in the center of the west wall of the office.  Schockman concluded that the fire had started at or near the floor level under that window.  Although he could not specifically identify the ignition source or the first fuel ignited, he concluded that the fire was intentionally set by an open flame igniting common combustibles located under that window.  Doc. #24-1, PageID##1325, 1343; Doc. #24-2, PageID#1384.  He collected samples of partially-burned clothing from the floor near the window and had them tested for the presence of accelerants.  The tests, however, came back negative.  Doc. #24-1, PageID#1330.

Schockman testified that, assuming that the candle was located on top of the computer tower, as Waldren and Talley told him it was, "there is no way that flame got to our area of lowest damage, which is four feet down to the ground and three feet north, without an intentional human act."  *Id.* at Page ID#1343.  He ruled out the possibility that the candle was accidentally knocked off of the computer tower by the cat, noting that, even after the fire, there was a protected

5

area on top of the computer tower.  *Id.*  He also found paper and other lightweight combustibles located on the desk that were not damaged in the fire.  *Id.* at PageID#1326.

One of the fire lieutenants, who had responded to the electrical fire in September and the fire in October, told Schockman that it appeared that some furniture had been removed from the living room.  Schockman testified that removal of contents of a house so they are not damaged is one indication of an intentionally-set fire.  *Id.* at PageID##1338-39.

In December of 2016, Waldren and Talley made statements under oath. They testified that they left the house between 9:30 and 9:45 that evening to drive to Deeds Point Dog Park, where they met Robert "Butch" Richardson, who generally arrives around 10:00 each night with his dogs.  Doc. #13, PageID#650-51; Doc. #14, PageID#698.  Talley stated that the glass candle, approximately three inches wide and six inches tall, was on top of the computer tower.  The candle was about two feet away from the curtains.  Only about an inch and a half of wax remained in the candle.  Talley lit the candle early that evening so that they could see in that part of the house.  She is almost certain that she left it burning when they went to the dog park.  Doc. #14, PageID##699-701, 704-05.

Allstate asked Richard Ruby of SRB to investigate their claim that they were at the dog park when the fire started.  On April 4, 2017, Ruby interviewed Butch Richardson.  He reported his findings to Allstate in letters dated March 29, 2017, and April 5, 2017.  Doc. #63-2, PageID##3007-08.

6

Ruby wrote that Richardson told him that he usually arrives at the dog park around 10:00 each night. However, on the night of the fire, he did not get there until about 10:20 and, by that time, Waldren and Talley had already left. Nevertheless, Waldren and Talley told Richardson that they were at the dog park on the night of the fire. *Id.* In addition, Richardson had spoken to Tony, Jose, and Harold, other regular visitors to the dog park, who all saw them there on the evening in question. *Id. See also* Doc. #20-3, PageID#915. On April 5, 2017, Ruby wrote in an email message to Allstate that "Richardson says the consensus is Waldrens arrived at 9:45 pm and left by 10:10 or 10:15. Richardson arrived at 10:20 and the others told him that the Waldrens just left." Doc. #63-2, PageID#3006.

Richardson agreed to ask Tony, Jose and Harold if they would be willing to talk to Ruby. A couple of days later, Richardson reported back to Ruby that they did not want to get involved. According to Richardson, "[t]hey think Allstate will try to bottle them up, not pay the claim. Richardson was upset about the claim not being settled. Stated insured had no place to go. Had been living at a shed at the dog park." Doc. #25-1, PageID#1581.

Allstate's denial letter, dated April 19, 2017, stated that, based on its own investigation, it concluded that Waldren "had the means, motive, and opportunity to be involved in the intentional setting of the subject fire." The letter further stated that Allstate concluded that Waldren "concealed material information and

made material misrepresentations during the claim investigation." Doc. #40-2, PageID#2491.

Waldren then retained counsel and hired Stephen L. Claytor, an independent fire investigator, to render an opinion concerning the origin and cause of the fire. On June 9, 2017, Mr. Claytor determined, as had the DFD, that the cause of the fire was accidental as a result of the unattended candle. Doc. #23-2, PageID##1138, 1156. Claytor found fault with much of Schockman's investigation, and noted that one of the DFD Fire Investigators expressed his opinion that Schockman was "biased from day one" against Waldren. *Id.* at PageID#1120.

On September 21, 2017, Waldren filed suit in the Montgomery County Court of Common Pleas against Allstate, alleging breach of contract, bad faith, and unjust enrichment. In addition, he sought declaratory judgment.[2] Allstate filed an Answer and a Counterclaim to recover monies advanced to date for alternative living arrangements. Then, on August 23, 2018, Allstate removed the case to federal court. Doc. #1.

Butch Richardson was deposed on February 22, 2019, more than two years after the fire. He denied telling Richard Ruby that, on the night of the fire, he arrived at the dog park later than usual. Doc. #36-1, PageID#2267. When asked

---

[2]  Waldren also asserted claims of professional negligence and breach of fiduciary duty against his Allstate agent, Evron Colhoun, but later voluntarily dismissed those claims.

if he recalled telling Ruby that he did not see Waldren or Talley there the night of the fire, he responded, "No. I told him they were there." *Id.* at PageID#2269. Richardson testified that, when he got to the dog park shortly after 10:00, "Chuck and Darlene were already there." *Id.* at PageID##2268-69, 2271-72. He denied telling Ruby that, although he had talked to others who saw Chuck and Darlene there that night, he did not see them himself. *Id.* at PageID#2276. Richardson also testified that Ruby "was not very nice at all. I did not like him." He claimed that Ruby tried to push him into agreeing to statements that were not true. *Id.* at PageID#2270.

Based on Richardson's deposition testimony, Waldren sought and was granted leave to file a First Amended Complaint. Doc. #40. He added a claim of tortious interference with contract against Richard Ruby and SRB Insurance Consultants, as well as additional factual allegations to support the claims against Allstate. Allstate again filed an Answer and a Counterclaim, Doc. #43. Ruby and SRB Insurance Consultants also filed an Answer to the First Amended Complaint, Doc. #48.

On December 13, 2019, Allstate filed a Motion for Partial Summary Judgment on Plaintiff's Claims for Bad Faith, Unjust Enrichment, and Declaratory Judgment, Doc. #52. Allstate has not moved for summary judgment on the breach-of-contract claim. On April 17, 2020, Defendants Ruby and SRB filed a Motion for Summary Judgment on the claim of tortious interference with contract, Doc. #60. Both motions are fully briefed and ripe for decision.

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

10

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

11

### III. Allstate's Motion for Partial Summary Judgment (Doc. #52)

Allstate has moved for summary judgment on Waldren's claims of bad faith

(Count II), unjust enrichment (Count III), and declaratory judgment (Count V).

Allstate, however, has not moved for summary judgment on Waldren's breach-of-

contract claim (Count I).

### A. Bad Faith Claim

Count II of the First Amended Complaint asserts a claim of bad faith in

Allstate's handling, investigation and payment of Waldren's fire loss claim.

Waldren alleges that Allstate:

> failed to provide payment for reasonable and appropriate alternative
> living accommodations for Plaintiff after the claim was submitted,
> failed to conduct a thorough and appropriate cause and origin
> investigation for the subject fire, ignored the determinations of the
> impartial Dayton Fire Department investigation of the subject fire,
> refused to provide its insured with transcripts of recorded statements
> which the insured provided as part of his cooperation with the
> investigation, constructively refused to provide its insured with the
> fire cause and origin report which Mr. Schockman generated and upon
> which it relied [] in order to deny the claim, and wrongfully cancelled
> Plaintiff's insurance policy.

Doc. #40, PageID#2454. Waldren further alleges that Allstate acted in bad faith

"by selecting, retaining and relying upon investigator Ruby who provided false

information regarding witness Richardson's contacts with Plaintiff at the Deeds

Point Dog Park." *Id.*

The bad faith claim is governed by Ohio law. "[A]n insurer has the duty to

act in good faith in the handling and payment of the claims of its insured. A breach

of this duty will give rise to a cause of action against the insurer." *Hoskins v.*

12

*Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 276, 452 N.E.2d 1315, 1319 (1983). However, "[m]ere refusal to pay insurance is not, in itself, conclusive of bad faith." *Id.* at 277, 452 N.E.2d at 1320. The insured must show that the insurer had "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal." *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936, 943 (quoting *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 699-700, 590 N.E.2d 1228, 1236)).

Allstate is entitled to summary judgment on this claim if, after viewing the evidence in a light most favorable to the insured, the court finds that "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Id.* at 630, 605 N.E.2d at 943. Waldren can survive summary judgment only by presenting "evidence which tends to show that the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim." *Id.*

Having reviewed the parties' briefs, and viewing the evidence submitted in a light most favorable to Waldren, the Court finds that the claim was fairly debatable and Allstate's denial of the insurance claim was premised on the then-known facts that gave rise to the claim. Based on the evidence presented, no reasonable juror could find that Allstate had "no reasonable justification" for denying the claim.

13

An insurance company asserting an arson defense must prove three elements: "(1) fire of an incendiary origin; (2) motive on the part of the insured; and (3) opportunity of the insured to cause the fire." *Caserta v. Allstate Ins. Co.* (1983), 14 Ohio App.3d 167, 169, 470 N.E.2d 430, 433. "[E]vidence that creates an issue of fact on an arson defense is sufficient, so long as it is not fraudulent, to create the reasonable justification to defeat a bad faith claim." *Abon, Ltd. v. Transcon. Ins. Co.*, 2005-Ohio-3052, 2005 WL 1414486, at ¶ 46. *See also Corbo Props., Ltd v. Seneca Ins. Co., Inc.*, 771 F. Supp. 2d 877, 887 (N.D. Ohio 2011) ("An insurer may be reasonably justified in denying an insured's claim for fire damage when there is sufficient evidence that the insured committed arson to obtain the claim proceeds.").

Here, there is disagreement among the three fire investigators on whether the fire was incendiary in nature. Jennifer Godsey of the DFD found that the fire was accidentally started by the lit candle. Stephen Claytor, hired by Waldren, agreed with Godsey. Brent Schockman, however, hired by Allstate, found that the fire was intentionally set, caused by an open flame being set to common combustibles near the baseboard under the window.

Waldren argues that there are several reasons why Allstate cannot reasonably rely on Schockman's report. For example, Schockman was relatively inexperienced, Doc. #24-1, PageID##1316-17, and Waldren maintains that he ignored relevant evidence that supported a finding that the fire was caused by the unattended candle. In addition, Schockman failed to obtain a copy of Godsey's

14

investigative report.  Accordingly, Waldren argues that Schockman's report does not provide reasonable justification for Allstate's denial of coverage.

These criticisms of Schockman will certainly be crucial to Waldren's breach-of-contract claim.  Nevertheless, the Court agrees with Allstate that they are not dispositive with respect to the bad faith claim.  Schockman is a certified fire investigator, and he explains in his report the evidence he relied upon in concluding that the fire was intentionally set.  Despite Waldren's criticisms of his investigation, there is no evidence that his report is fraudulent.  The Court finds that Schockman's report is sufficient to create a genuine issue of material fact on the question of whether the fire was incendiary in nature.

There is also ample evidence to create a genuine issue of material fact with respect to motive on the part of Mr. Waldren.  By all accounts, he and Talley were in fairly dire financial straits.  Waldren's only source of income was $790.00 in monthly disability payments.  Doc. #13, PageID#644.  He also received food stamps.  *Id.* at PageID#653.  Talley was working two jobs at $8.10 per hour, but had filed for bankruptcy in Tennessee.  Doc. #14, PageID#691.  They allegedly told Jennifer Godsey that the house, which Waldren purchased in July of 2016, was a "money pit."  Doc. #24-1, PageID#1321.  They eventually fixed the roof so that they could get their homeowner's insurance reinstated.  After the September electrical fire, Waldren took out a loan on his car, but they still did not have enough money to fix the electrical problems so that they could get the electricity

15

turned back on. At the time of the fire, their bank accounts were largely depleted. Doc. #25-3, PageID#1642.

As to the third element, opportunity of the insured to cause the fire, it is undisputed that Waldren and Talley were the only people in the house that evening. They locked the door behind them when they went to the dog park and there was no sign of forced entry. A neighbor reported the fire shortly after they left. A reasonable jury could find that Waldren and Talley had the opportunity to set the fire before they left the house that evening.

Based on the foregoing, the Court concludes that, even viewing the evidence in a light most favorable to Waldren, there is sufficient evidence to create a genuine issue of material fact on Allstate's arson defense. This, in turn, creates the reasonable justification necessary to defeat the bad faith claim. *Abon,* 2005-Ohio-3052, at ¶ 46. This conclusion is bolstered by the fact that Waldren and Talley both admitted that they understood why, under the circumstances presented here, Allstate was investigating the claim as suspicious. Doc. #13, PageID#646; Doc. #14, PageID#706.

Allstate also denied Waldren's claim based on alleged misrepresentations made by Waldren to Allstate concerning the unattended candle being the cause of the fire, and on alleged misrepresentations Waldren made to Richard Ruby about seeing Butch Richardson at the dog park on the night of the fire. Again, it cannot be said that Allstate had "no reasonable justification for refusing the claim" on this basis. Allstate relied on Brent Schockman's report concerning the cause and origin

16

of the fire. It also relied on Richard Ruby's report, which stated that, contrary to what Waldren and Talley had told Allstate, Butch Richardson did not see them at the dog park on the night of the fire. Richardson's deposition, in which he accuses Ruby of lying about what he told him, was not taken until long after Allstate denied the insurance claim, and there is no evidence suggesting Allstate had any reason to doubt Ruby's report at the time the claim was denied.

At a minimum, Waldren's insurance claim was fairly debatable. *Tokles & Son,* 65 Ohio St.3d at 630, 605 N.E.2d at 943. Again, Waldren has failed to present sufficient evidence from which a reasonable jury could find that Allstate had no reasonable justification for denying the insurance claim on the basis of misrepresentations allegedly made by Waldren, and that Allstate either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim. *Id.* For these reasons, the Court sustains Allstate's Motion for Summary Judgment on the bad faith claim and dismisses Count II with prejudice.

## B. Unjust Enrichment Claim

Count III of the First Amended Complaint asserts a claim of unjust enrichment. Unjust enrichment occurs "when a party retains money or benefits which in justice and equity belong to another." *Liberty Mut. Ins. Co. v. Indus. Comm'n of Ohio* (1988), 40 Ohio St.3d 109, 532 N.E.2d 124, 125 (internal quotation omitted). Waldren alleges that he conferred a benefit on Allstate in the form of policy premiums, and that Allstate has retained that benefit by refusing to

17

pay his claim. He further alleges that Allstate unjustifiably cancelled his insurance policy and has failed to refund the premium paid.

Allstate maintains that it is entitled to summary judgment because, under Ohio law, a plaintiff cannot recover under a theory of unjust enrichment when an express contract—here, the insurance policy—covers the same subject. *Padula v. Wagner*, 2015-Ohio-2374, ¶48, 37 N.E.3d 799, 813. Waldren does not deny that the insurance policy governs the question of whether Allstate is required to pay his claim. Waldren argues only that, because there is a factual dispute over the liability limits of the insurance policy, the unjust enrichment claim should survive summary judgment. The Court disagrees.

The limits of liability, as stated in the homeowner's policy are as follows: $65,000 in Dwelling Protection, $6,500 in Other Structures Protection, $48,750 in Personal Property Protection, and Additional Living Expense for "Up to 24 months not to exceed $6,500." Doc. #40, PageID#2461. Nevertheless, in an Affidavit dated November 17, 2018, Waldren states that certain information he received from his Allstate agent, Evron Colhoun, concerning the policy limits, led him to believe that the policy limits were substantially higher. Doc. #23-6, PageID##1304-05.

Waldren attaches to his Affidavit an undated letter from Colhoun to Fifth Third Bank, the mortgagee, concerning the new homeowner's policy that was to go into effect on October 14, 2016. *Id.* at PageID#1306. Colhoun's letter refers to two attachments. Neither the letter nor the attachments have been

18

authenticated. The first purported attachment shows that the initial policy was canceled on August 19, 2016, because Waldren had failed to correct the roofing deficiencies required by the underwriter. *Id.* at PageID#1307. The coverage limits on this attachment match those that appear on the actual policy—$65,000 in dwelling protection, $39,000 for personal property, and $6500 in additional living expenses. *Id.*

The second purported attachment allegedly refers to the soon-to-be issued new policy, which would be effective from October 14, 2016, until October 14, 2017. This attachment, dated October 6, 2016, is titled "House and Home Base Insurance Quote." It shows significantly higher policy limits: $139,254 in dwelling protection, $104,449 in personal property protection, and $13,927 in additional living expense. The quoted premium price is $696.43 per year but was subject to change based on the coverages, limits and deductibles chosen by the insured. *Id.* at PageID#1308.

Even if these documents were properly authenticated, the parol evidence rule bars their consideration. "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.' 11 Williston on Contracts (4 Ed.1999) 569–570, Section 33:4." *Galmish v. Cicchini*, 2000-Ohio-7, 90 Ohio St. 3d 22, 27, 734 N.E.2d 782, 788.

Moreover, Waldren's Affidavit concerning what Colhoun told him, Doc. #23-6, PageID##1304-05, contradicts Waldren's earlier deposition testimony, wherein he testified that the coverages listed in the policy itself were accurate. Doc. #11, PageID#444. This Affidavit is insufficient to create a genuine issue of material fact. *See Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (holding that a party cannot create an issue of fact by submitting an affidavit contradicting his own prior testimony).

Likewise, the Affidavit contradicts Waldren's Sworn Statement in Proof of Loss, wherein he stated that the total policy limits were $120,250. Doc. #20-5, PageID#1069. Again, this is insufficient to create a genuine issue of material fact. *Hanson v. City of Fairview Park*, 349 F. App'x 70, 74 (6th Cir. 2009) ("a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement.") (internal quotation omitted).

In short, given that there is no question that an express contract governs the relationship between Waldren and Allstate, Waldren, as a matter of law, cannot recover under a theory of unjust enrichment. Even if this did not bar the claim, the alleged factual dispute over the liability limits of the insurance policy is insufficient to defeat Allstate's motion for summary judgment. The Court therefore SUSTAINS Allstate's Motion for Summary Judgment as to Count III, and dismisses the unjust enrichment claim with prejudice.

## C.    Declaratory Judgment Claim

In Count V of the First Amended Complaint, Waldren seeks declaratory judgment under Ohio Revised Code § 2721.01 *et seq.* with regard to the rights and obligations between him and Allstate concerning: (1) coverage for the fire loss; and (2) coverage limits for "Dwelling Protection," "Other Structures Protection," "Personal Property Protection" and additional living expenses.

Courts may refuse to render a declaratory judgment if that judgment "would not terminate the uncertainty or controversy giving rise to the action or proceeding in which the declaratory relief is sought."  Ohio Rev. Code § 2721.07.  The Court agrees with Allstate that, to the extent that Waldren seeks a declaratory judgment concerning whether he is entitled to coverage for the fire loss under the terms of the homeowner's policy, this request is completely subsumed in his breach-of-contract claim, a claim which Allstate has not challenged in its motion for summary judgment.

Faced with a similar issue in another case, this Court previously held that:

Declaratory judgment is typically sought before an injury-in-fact has occurred. *National Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 279 (6th Cir. 1997). "It gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." It thereby minimizes "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

Here, Plaintiffs' claims have already ripened into a cause of action, and Plaintiffs have sought damages under several alternative theories.

> Although the existence of other remedies does not preclude a declaratory judgment action, it is one of the factors that must be considered in determining whether declaratory judgment is appropriate. In this case, a declaratory judgment concerning the validity and enforceability of the various agreements would not settle the entire controversy. Regardless of how the Court resolved that question, Plaintiffs would presumably still pursue their other causes of action, seeking monetary damages either in contract or in tort. The validity and enforceability of the contracts have already been placed at issue, and Plaintiffs' claim for damages is a better and more effective remedy.

*Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 938 (S.D. Ohio 2012).

The same is true here. Granting a declaratory judgment on the question of whether Allstate must pay Waldren's insurance claim would not terminate the controversy, because Waldren would still seek damages for the alleged breach. Given that his breach-of-contract claim is a more effective remedy for one seeking complete relief, the Court declines to exercise its discretion to entertain a declaratory judgment claim on the question of coverage for the fire loss.

Waldren also seeks a declaratory judgment concerning the limits of liability under the terms of the homeowner's policy.  Again, he alleges that, based on representations made by his Allstate agent, Evron Colhoun, he reasonably believed that his Allstate policy had higher limits of liability than those set forth in the policy itself, and that these higher limits were in place on the date of the fire.  Again, given that the integrated contract of insurance is unambiguous, the parol evidence rule bars consideration of such evidence.  Given that Waldren has submitted no admissible evidence in support of his argument that the coverage limits are higher

22

than those stated in the homeowner's policy, Allstate is entitled to summary judgment on this portion of his declaratory judgment claim.

For these reasons, the Court sustains Allstate's Motion for Summary Judgment as to Count V, and dismisses the declaratory judgment claim with prejudice.

## IV. Richard Ruby and SRB Insurance Consultants' Motion for Summary Judgment (Doc. #60)

Defendants Richard Ruby and SRB Insurance Consultants have moved for summary judgment on the only claim asserted against them, a claim for tortious interference with contract. In Count IV of the First Amended Complaint, Waldren alleges that Butch Richardson told Richard Ruby that he saw Waldren and Talley at the Deeds Point Dog Park on the night of the fire.  Ruby, however, reported to Allstate that Richardson denied seeing Waldren and Talley on the evening in question.  Waldren alleges that Ruby provided this false information to Allstate knowing that it would serve as a basis for denying Waldren's claim, and that Ruby had no justification for providing false information to Allstate.  Doc. #40, PageID#2455.

In order to succeed on a claim of tortious interference with contract, Waldren must prove: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the

contract's breach; (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., LPA v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 707 N.E.2d 853, ¶1 syl.

Ruby and SRB concede the existence of a contract, but argue that Waldren cannot prove the other four elements of his claim.  With respect to the second element—Ruby's knowledge of the insurance policy—Ruby testified that he was not given a copy of the policy, the claim report, the Notice of Loss, or any other document confirming that Waldren was the insured.  Doc. #63-1, PageID#2922. Nevertheless, based on the evidence presented, a reasonable jury could infer that Ruby knew that a contract existed and that Waldren was the insured.  At the time he received the assignment from Allstate, Ruby knew that a claim had been filed, and he was given documents that referred to Waldren as the "insured."  Doc. #63-2, PageID##2993-94.

The next question is whether a reasonable jury could find that Ruby intentionally procured the contract's breach by lying to Allstate about what Richardson told him.  "'Intentional procurement' refers to conduct that causes a third party to breach its contract, or that leaves a third party with no choice but to breach its contract." *Union of Needletrades, Indus. and Textile Emps. AFL-CIO v. Am. Capital Strategies, Ltd.*, 546 F. Supp. 2d 546, 561 (S.D. Ohio 2008) (citing 4 Restatement 2d, Torts § 766 cmt. h)).  To establish this third element, Waldren "must either (1) prove that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) prove that the defendant knew that interference was certain or substantially certain to occur as a result of

24

its actions." *Ginn v. Stonecreek Dental Care*, 2015-Ohio-1600, ¶ 17, 30 N.E.3d 1034, 1041.

Waldren suggests that Ruby had a financial motive to provide false information that Allstate could use to deny Waldren's insurance claim. Ruby testified that, in recent months, SRB's investigative assignments from Allstate had decreased substantially. Doc. #63-1, PageID##2914-15. Waldren suggests that, if Ruby provided information that could serve as a basis for denying this insurance claim, Allstate may give him more assignments.

Ruby testified, however, that assignments had decreased because of a change in Allstate's policy. Allstate was going to start assigning investigative work only to companies that were nationally affiliated with Allstate. *Id.* at PageID#2914. SRB was not a national affiliate. In fact, Waldren's case was the last assignment that Ruby received from Allstate. *Id.* Therefore, it is purely speculative to suggest that, if Ruby provided false information so that Allstate could deny Waldren's claim, Allstate would hire him to do additional work. Moreover, Ruby testified that Allstate paid him for his services regardless of the outcome of the investigation. Accordingly, he had no financial incentive to procure a denial of Waldren's insurance claim. *Id.* at PageID#2952. Based on the evidence presented, no reasonable jury could find that Ruby acted with the purpose or desire to interfere with Allstate's performance of the contract.

Nor could a reasonable jury find that Ruby knew that any interference on his part was certain or substantially certain to occur as a result of his actions. Ruby

did admit that he was aware that, under the terms of the insurance policy, coverage would be denied if Waldren made misrepresentations or fraudulent statements concerning the claim. *Id.* at PageID#2920.

Moreover, there is a clear factual dispute between what Butch Richardson says he told Ruby and what Ruby reported to Allstate. As discussed above, Ruby reported to Allstate that Richardson did not personally see Waldren or Talley at the dog park on the evening in question. Richardson allegedly told Ruby that he did not arrive at the dog park until about 10:20 that night and that Waldren and Talley were already gone. Richardson, however, now flatly denies making these statements.

Nevertheless, even if there is a genuine issue of material fact concerning what Richardson told Ruby on this subject, this does not necessarily mean that there is a genuine issue of material fact concerning whether Ruby intentionally procured Allstate's breach of contract. Waldren must prove that Ruby lied, knowing that Allstate was certain or substantially certain to deny the insurance claim as a result of that lie.

The key to Waldren's and Talley's alleged alibi is not that they *saw Butch Richardson* at the dog park on the night of the fire, but rather that they were *at the dog park* when the fire started. Regardless of whether Richardson backed up their claim that they saw him at the dog park that evening, Ruby also reported to Allstate that there were three other individuals who actually saw Waldren and Talley at the dog park during the time in question and could corroborate their alibi.

26

Doc. #63-2, PageID#3008. Under these circumstances, no reasonable jury could find that Ruby knew that Allstate was certain or substantially certain to deny Waldren's insurance claim as a result of his alleged false statement.

The Court finds that Waldren has failed to present sufficient evidence to create a genuine issue of material fact on the question of whether Ruby intentionally procured Allstate's breach of the insurance contract. Accordingly, the Court need not address the other elements of the claim—lack of justification and resulting damages. Count IV, the tortious interference with contract claim asserted against Richard Ruby and SRB Insurance Consultants, is dismissed with prejudice.

## V. Conclusion

For the reasons set forth above, the Court SUSTAINS Defendant Allstate's Motion for Partial Summary Judgment on Plaintiff's Claims for Bad Faith, Unjust Enrichment, and Declaratory Judgment, Doc. #52 and SUSTAINS Defendants Richard L. Ruby and SRB Insurance Consultants' Motion for Summary Judgment, Doc. #60.

All that now remains for trial, currently set for June 28, 2021, is Waldren's breach-of-contract claim against Allstate.

Date: September 1, 2020

(tp - per Judge Rice authorization after his review)

**WALTER H. RICE**
**UNITED STATES DISTRICT JUDGE**